15356

HENDERSON v. CAPITAL LIFE & HEALTH INS. CO.

(18 S. E. (2d), 605)

December, 1940.

The order of Judge Oxner directed to be reported follows:

This is an action for alleged fraudulent breach of contract alleged to have been accompanied by fraudulent acts. The jury returned a verdict in favor of the plaintiff for both actual and punitive damages. A motion for new trial was marked "heard" and the motion heard on written arguments which have just been filed.

The motion is based upon eighteen grounds. The first ten grounds relate to alleged error in refusing to grant a nonsuit and directed verdict. This necessitates a review of the testimony. I shall not endeavor to cover all the testimony, but the substance of the pertinent portions thereof.

The plaintiff is a colored woman, without education, who lives in Bamberg County and has a rather large family. She carried insurance on herself, her husband and a number of her children. The money for the premiums was furnished, in part at least, by her husband, but she seems to have had principal charge of the matter of making payments. While thus carrying insurance on certain members of her household, during the latter part of April or early in May, 1940, application was made for a policy on the life of her son, William Henderson, Jr.

She was already carrying certain other policies with the defendant and she testifies that on numerous occasions the agent, Boylston, would advance premium payments for her and she would reimburse him on the next trip. When the

application for the policy of $116.00 on the life of William Henderson, Jr., was made, no premium was paid at the time said application was taken by the agent, Boylston. Pursuant to this application, the policy in controversy on the life of William Henderson, for $116.00, was issued by the defendant on May 6, 1940. A week or two later Boylston, the agent, having had said policy delivered to him by the company, went to the home of the plaintiff. According to the plaintiff's testimony, when Boylston came, she was not at the house but was away in the field hoeing cotton. Her husband advised Boylston to that effect and stated that if Boylston would wait a little while that the plaintiff would return and pay for the policy. The husband stated that the money was in the house but apparently did not know where it was. Boylston told the husband of the plaintiff that he was in a hurry and for him to tell the plaintiff to put the money in an envelope and he would get it on his next trip. Boylston left with the husband the policy in controversy and the receipt book. And, in effect stated that the policy was then in force. The husband offered to bring the money to Boylston the following Saturday in Bamberg, but Boylston preferred to collect the money on his next trip to the plaintiff's home. According to the testimony of the husband, he asked Boylston what would be the situation if anything should happen and Boylston replied that he always took care of the plaintiff, paid her premiums and she paid him on his next trip. According to the plaintiff's testimony, there were no conditions whatsoever attached to the delivery of said policy and receipt book and Boylston was to collect the premium on the next trip. The testimony of the plaintiff tended to show that there was no agreement whatsoever or condition that the policy was not to be effective until the insured was seen by the agent or until the first premium was paid.

According to the testimony of the defendant, on this occasion the plaintiff's husband stated that the insured was not there and Boylston stated that they must be sure to have

the boy there on the next trip together with the money to pay the premium. Further, that the policy and receipt book were left at the plaintiff's home to enable the plaintiff and other members of her family to read the policy to see just exactly what they were getting. In his testimony, Boylston denied that there was any agreement to extend credit for the premium or that the policy was to be immediately effective.

The insured died on or about May 27, 1940, or· a week or two after the policy was left at the plaintiff's home. He appeared to be in good health on Saturday and died the next day in a hospital in Orangeburg. The first news of his death came the following Monday and was first learned by the plaintiff's husband. According to plaintiff's testimony, the husband after learning of the death of the insured, went to the home of Boylston to obtain the insurance money to pay burial expenses. According to this testimony, Boylston, when first advised of the insured's death, stated that he would get blanks for the plaintiff to sign in order to get the insurance money; that Boylston then went back into his home and upon returning stated that the insurance was not in force because the initial payment was never made. Boylston was reminded of his alleged agreement that the policy was to be immediately effective and that the initial payment might be paid upon the next trip, whereupon Boylston stated that he was sorry the down payment had not been made but that such an agreement to extend credit for the premium was against the law.

According to the defendant's testimony, on this occasion plaintiff's husband stated that he wanted to pay the insurance premium and that the insured was dead, whereupon Boylston stated that he was very sorry but the policy was not in force because the premium had not been paid.

It is undisputed that immediately after the foregoing conversation Boylston went to the home of the plaintiff, at which time the plaintiff and her children did not know of the insured's death. According to testimony of the plaintiff, Boylston came to her home, advised them of the death of the in-

sured, denied he had seen her husband and demanded the policy in controversy. At that time the plaintiff and other members of her family were greatly grieved over the death of the insured and upon inquiring of Boylston about the payment of the insurance money, Boylston said he was going to the headquarters of the insurance company, would do all he could to get the money and would be back that night. Boylston, on this occasion, took the policy and the receipt book which have never been returned.

Boylston, in his testimony, stated that he knew the policy was not effective and that he went to the home of the plaintiff to secure the policy and receipt book because it was not in force. That he told the plaintiff at the time he took the policy and the receipt book that she would not get any money because the premium had not been paid and that he carried the policy and receipt book to Columbia and placed them in a drawer where they remained for several months. Boylston denied that upon taking the policy, he promised to do all he could to collect the money and, on cross examination, stated that he had to leave the policy in Columbia for the insured was dead and no money would ever be paid on the policy and he would have to report it to the home office. On cross examination, Boylston was asked why as soon as he heard of the death of the insured, he went to the home of the plaintiff and took the policy. He replied that this was done because nothing had been paid on the policy and he had to report it back to the company.

Sometime later the matter was turned over to counsel for the plaintiff, who on June 25, 1940, demanded the policy. A further demand was made by counsel for the plaintiff on July 1, 1940. Several other demands were made and the policy not being returned, this suit was instituted on July 15, 1940. The policy was produced by the defendant upon notice on the trial of the case. According to the defendant's testimony, the policy was misplaced and could not be produced.

In its answer, the defendant contended that the policy was not to be effective until its agent saw the insured and ascertained that he was insurable and would not be effective until the initial premium was paid. It was further contended by the defendant that the policy was without consideration.

It is urged by the defendant that under the testimony the policy was never effective for the foregoing reasons. The policy contained the following provision: "In consideration of the payment of ten cents, weekly in advance, each Monday hereafter, insures William Henderson, Jr. * * * . this policy is in full benefit from the date it is issued and delivered."

The policy contained no stipulation that it was not to be effective until the initial premium was paid nor did it contain any stipulation that it was not to be effective until the agent saw the insured.

Under the foregoing testimony, I think it was a question for the jury as to whether or not said policy was valid and effective upon delivery of same to the husband of the plaintiff. Under the well-settled rule, the company may waive the time and method of the payment of premium. It will be observed that the policy by implication acknowledges receipt of the initial premium. It has been repeatedly held in this State that the manner and method of the payment of the initial premium may be waived and that credit may be extended for the initial premium. In this connection, see *Williams v. Philadelphia Life Insurance Co.*, 112 S. C., 436, 100 S. E., 157; *Galphin v. Pioneer Life Insurance Co.*, 157 S. C., 469, 154 S. E., 855; *Wright v. New England Mutual Life Insurance Co.*, 165 S. C., 190, 163 S. E., 133.

In the *Galphin case, supra,* the insured did not pay the initial premium, but had an agreement with the agent of the company to keep the policy in good standing until the insured started to gin in the fall, at which time the insured would pay. The policy provided that it would not take effect until the payment of the initial premium. It was held that

the agent had implied authority to vary the mode and time of payment of the premium.

I think the effect of the plaintiff's testimony in this case was that credit was extended for the initial premium until the agent made his next visit, but if it be construed as a promise on the part of the agent to advance the premium for the plaintiff, and to be reimbursed on his next visit, such would be evidence of waiver by the company, particularly in view of the fact that the policy contained no stipulation that it was not to be effective until the premium was paid and, as above stated, impliedly recognized the payment of the initial premium. It is further contended that the insured had no knowledge of the insurance in controversy. There is testimony to the effect that the insured did know of and acquiesced in the taking of this policy. I see no error in submitting to the jury the issue of actual damages.

It is further contended, in any event, that there was no testimony to go to the jury as to punitive damages. In this connection, it is first contended that the complaint fails to allege any fraudulent acts. The complaint is rather general in terms, but I think sufficiently alleges that the breach was accompanied by fraudulent acts in the manner and method by which said policy and receipt book were procured and the conduct of the defendant in refusing to return same, after demand. However, there was no motion to make the complaint more definite and certain, nor was there any motion to strike. If there was any testimony, therefore, showing that the breach was accompanied by fraudulent acts, the issue as to punitive damages was properly submitted to the jury.

Of course, in passing upon this motion, the testimony must be considered most favorably from the standpoint of the plaintiff. When all the circumstances are considered, I think there was sufficient evidence of fraudulent intent and fraudulent acts to warrant the submission of punitive damages to the jury.

As was said by the Court in *Cook v. Metropolitan Life Insurance Co.*, 186 S. C., 77, 194 S. E., 636, 639: "Fraud may be deduced not only from deceptive or false representations, but from facts, incidents and circumstances which may be trivial in themselves, but decisive in a given case of the fraudulent design."

Under the verdict of the jury, this policy was in force and effect when taken from the plaintiff's home. Immediately after learning of insured's death through plaintiff's husband, the agent went to the home of the plaintiff, and taking plaintiff's testimony as true denied that he had seen plaintiff's husband, and, although he had just a little while before stated to the plaintiff's husband that the policy was of no effect, he demanded the policy and promised the plaintiff that he would do all he could to collect it, would go to headquarters and be back that night, and never returned with the policy. Considering the testimony from the standpoint of the plaintiff, he was representing the policy was of no force and effect when, as later developed, it was; that· he would do all he would to collect it and would be back that night when, according to his testimony, his sole purpose in taking the policy was to get it out of the possession of the plaintiff and turn it over to the company. Was he acting in good faith in going to the plaintiff's home, under circumstances of such great grief and distress in the home, and procuring this policy? Or was he afraid that the policy might be used as a basis for a later claim and that it was better to take the papers from the possession of the plaintiff in order to avoid any claim being made? I think these were all questions for the jury to consider.

It would serve no useful purpose to review the applicable cases in this State bearing on this question. It is sufficient to cite the following: *Bradley v. Metropolitan Life Ins. Co.*, 162 S. C., 303, 160 S. E., 721; *Derrick v. North Carolina Mutual Life Insurance Co.*, 167 S. C., 434, 166 S. E., 502; *Walker v. Life Insurance Co.*, 175 S. C., 153, 178 S. E., 618; *Medlin v. Life Insurance Co. of Virginia*, 175 S. C.,

161, 178 S. E., 615; *Kelly v. Guaranty Fire Insurance Co.,* 176 S. C., 275, 180 S. E., 35; *Calder v. Commercial Casualty Insurance Co.,* 182 S. C., 240, 188 S. E., 864; *Scott v. Bankers Reserve Life Insurance Co.,* 183 S. C., 242, 190 S. E., 713; *Neely v. Industrial Life & Health Ins. Co.,* 192 S. C., 71, 5 S. E. (2d), 568.

In the *Medlin case, supra,* the policy was obtained under the pretext of having same revived and was not returned after repeated demands.

In the *Derrick case, supra* (167 S. C., 434, 166 S. E., 503), the policy was obtained under the promise that the loss would be paid at once but was never returned. The Court said: "The question for the jury was whether, by a false promise, the defendant gained possession of the plaintiff's policy, his own property, with the intention of depriving him of the use of it in the collection of his claim, and thereby practiced a fraud upon him—in other words whether the promise was made by the company with no intention of fulfilling it, but for the purpose of defrauding the plaintiff."

The foregoing language is applicable here. Did this agent procure this policy to see whether or not the plaintiff was entitled to collect anything thereon, or did he make the promise as testified to by the plaintiff with no intention of fulfilling it, but for the purpose of defrauding the plaintiff?

Under all the circumstances, I am unable to conclude, as a matter of law, that the evidence in the case excludes all reasonable inferences of fraud.

I shall not consider the remaining grounds of the motion for a new trial *seriatim.* Some of them raise the same questions as were raised in the motion for nonsuit.

It is complained that I erred in charging the jury the law of waiver. I see no error in this respect.

It is contended that my charge as to the general law of contracts was too general and not applicable to the contract in question. If counsel wished a more specific instruction, he should have so requested at the conclu-

sion of the charge, when the Court asked if there was any-thing further.

It is further urged that the definition of fraud which I gave was too general. There was no request for any further instructions and, if anything, I think the definition of fraud that I gave was probably too favorable to the defendant. This was not an action for fraud and deceit, but for breach of contract accompanied by fraudulent acts.

Finally, it is urged that I erred in permitting the plaintiff to reopen her case so as to show that the insured had knowl-edge of the policy in controversy and acquiesced therein. It is, also, contended that this conversation, made in the absence of the defendant, was incompetent.

One of the grounds of the motion for nonsuit was that the insured had no knowledge of the policy in controversy and, therefore, that the same was against public policy. This defense was not raised by the answer and it might be plausibly argued that it was necessary to have done so, in order to get it before the Court. In view of the fact that the plaintiff had no knowledge that such an issue was to be raised until the motion was made, in the exercise of my discretion, I permitted the plaintiff to show such knowledge on the part of the insured. My doing so, in my opinion, was in the ends of justice and a fair and impartial trial. In no event, could my doing so be prejudicial to the defendant. The testimony thus permitted was only to the ef-fect that the insured knew of the mother taking out this policy and acquiesced therein. Such testimony as to his knowledge would be competent regardless of whether the de-fendant had an agent present when such conversation took place. After all, the inquiry was whether or not the son knew of this policy, which inquiry would have been proper with-out going into any conversation.

I have carefully considered all the grounds of the motion and it is ordered that the motion for a new trial, upon all grounds, be, and the same is hereby, refused.

*Mr. D. McK. Winter,* of Columbia, for appellant,

*Mr. J. Carl Kearse* and *Mr. Julius B. Ness,* of Bamberg, and *Mr. Carlisle Roberts,* of Columbia, for respondent,

January 26, 1942.

*Per curiam.*

The facts of this case, and the main issues raised by the appeal are so clearly set forth in the order of Judge Oxner refusing motion for new trial, which will be reported, it is deemed unnecessary to restate them. The order also satisfactorily disposes of practically all of the legal questions raised by the exceptions, the result of which is approved by this Court.

Appellant contends that the numerous questions asked and comments and rulings made by the presiding Judge during the trial in the presence of the jury separately and taken as

a whole were prejudicial to defendant and tended to create an impression of a favorable tendency toward respondent. We have carefully read and considered the record and it does not in our opinion sustain these contentions.

Other questions raised by the exceptions are either directly disposed of in the order refusing a new trial, or are so closely and inseparably related thereto, as to be necessarily concluded thereby, and do not require special comment. All of these questions, however, have been duly considered and are found to be lacking in merit.

. The judgment is, therefore, affirmed and all exceptions overruled.

MR. CHIEF JUSTICE BONHAM and MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES concur.